## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM L. JOHNSON, <br> an Individual, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | 09 C 1860 |
| v. | ) <br> ) <br> ) | Honorable Charles R. Norgle |
| REICHHOLD, INC., a Delaware <br> Corporation Doing Business in Illinois, and <br> THOMAS COLWELL, an individual, | ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Reichhold, Inc.'s (Reichhold) and Thomas Colwell's (Colwell) (collectively, Defendants) motion for summary judgment against the company's former employee, Plaintiff William L. Johnson (Johnson). Johnson claims that Defendants violated the FMLA and ERISA by terminating his employment after he took several extended leaves of absence pursuant to the company's short-term disability policy. In support of the motion, Defendants argue that their decision to terminate Johnson was justified, not because of his leave, but because Defendants believed that Johnson had the functional capacity to return to work and because they had an honest suspicion that Johnson was misusing his medical leave. For the following reasons, Defendants' motion is denied.

## I. BACKGROUND

### A. FACTS

The following facts are undisputed unless otherwise noted. Johnson worked at Reichhold as an Emulsions Operator from sometime in 1986 until May 11, 2007. His supervisor at all

relevant times was Ron Zeigler (Zeigler), who answered to the Plant Manager, Tom Colwell. All three worked in Reichhold's chemical manufacturing plant in Morris, Illinois. Reichhold's corporate offices are located in Raleigh, North Carolina, where Patricia Kerbert (Kerbert), the company's HR Director, was stationed.

Reichhold maintained a short-term disability (STD) policy as a benefit for its employees. Under the plan, employees received one-hundred percent of their salaries for up to twenty-six weeks when they took time off for a qualifying medical reason. Johnson took advantage of the company's policy several times throughout his employment. He first took medical leave in 2003, and thereafter he took medical leave each year until 2007. The parties' dispute centers on Johnson's various leaves during the last three years of his employment.

In 2005 Johnson took STD leave to recover from knee surgery. It was scheduled to begin on January 6, 2005 and last approximately four to six weeks. The day before Johnson was scheduled to return to work, he called Zeigler and requested an emergency vacation day. Johnson told Zeigler that he needed a vacation day to handle a dispute that arose over whether he paid for gasoline during a trip he took, during his leave, to Alto Pass, Illinois, approximately 300 miles from his home. Johnson disclosed to Zeigler that he had gone fishing during the trip. Zeigler relayed this information to Colwell, who then called Johnson and asked him to come to the office. Johnson obliged, and at the meeting Colwell told Johnson: "If you're well enough to be out fishing, then you probably are well enough to return to work. Please don't abuse the STD program. Use it judiciously." Colwell Dep. at 55. Colwell testified that, in saying this to Johnson, it was his intention to have Johnson "recognize that it appeared as though he were abusing the STD program." Id. at 55-56. Ultimately Colwell refused to approve Johnson's request for a one-day emergency vacation. Johnson complied and returned to work.

On March 31, 2005 Colwell wrote a memorandum to the company's file regarding the above incident. In that memo, Colwell stated that at one point he contacted Johnson and "explained to him that regardless of the excuse for missing work that he had excessive absences (two successive operations on the same knee for the same reason)," and thus he could not allow the emergency vacation. Pl.'s App., Vol. II, Tab I., Ex. 29. Also, Colwell explained that he emphasized to Johnson "that his lengthy absence placed extra stress on all the personnel in his department." Id.

The following year Johnson requested leave as of June 26, 2006, after he was taken to the hospital by ambulance for a suspected heart attack. The next day, on June 27, 2006, Colwell sent an e-mail to Kerbert and John Daniels, Reichhold's Vice President of Manufacturing, which contained the subject line, "STD Again." In the message Colwell listed all of Johnson's previous leave requests and concluded, "I am requesting recommendations concerning who we might use as an investigator." Id., Ex. 10. Kerbert responded that she agreed with Colwell's request for an investigator, though she asked whether Colwell could wait to initiate the investigation so that the company could use an investigator with whom it had a prior relationship. Id. Colwell replied:

> I hate to wait simply because of the type of incident. I'm guessing that he will be released from the hospital today. It just happens that he was scheduled for vacation next week. I think we need immediate surveillance due to the circumstances.

Id. In the end, the company did not initiate an investigation, though Colwell testified that by 2006 he thought that Johnson's leave "was getting excessive." Colwell Dep. at 136.

In 2007 Johnson again took STD leave following a traffic accident, in which an eighteen-wheel tractor-trailer struck Johnson's car while he was stopped at a red light. Johnson showed no outward signs of physical trauma, though his treating physician, Dr. Cumba, diagnosed Johnson with neck muscle spasms and generalized muscle strain. Based on this assessment, Dr.

Cumba believed that Johnson could return to work within seven to ten days. Johnson did not return to work within seven to ten days. Instead, Johnson extended his leave approximately each week, for seven additional weeks. Johnson presented the company with a note from either his doctor or his doctor's nurse that validated each extension. Dr. Cumba prescribed physical therapy that Johnson was to complete during his leave.

At some point between the third and fifth weeks of Johnson's tractor-trailer leave, Colwell hired a private investigation agency to conduct surveillance on Johnson's activities during the leave period. Colwell testified that by this point he had become suspicious that Johnson was abusing his leave because, back in 2005, Johnson admitted to having gone fishing while on leave. This prior admission, says Colwell, prompted his decision to hire a private investigator. Colwell Dep. at 54-55, 62, 88. How strenuous fishing is, as carried out by Johnson, is not fully developed, but that it took place two years earlier was not forgotten by Colwell.

Over the course of several days in April 2007, the private investigator compiled hours of video surveillance and sent to Colwell an edited version for his review. The video revealed that Johnson engaged in the following activities, which Colwell deemed relevant: pulling a cord to start a lawn mower; mowing the lawn using a push-mower; emptying the lawn mower's grass-catcher by hand; practicing casting a fishing pole; and driving. Colwell determined that if Johnson could engage in these activities, he could have returned to work as of the dates the investigator made the video. Colwell made this determination, he says, based on his own personal experience serving in Johnson's same position at Reichhold several years before. According to Colwell, Johnson's position involved only "some physical activity," with only a few physically demanding duties, such as "tank cleaning" and "moving drums" by hand. Id. at

4

164-66. Colwell testified that Johnson's position "was for the most part not an overly strenuous job." Id. at 163. But this is a point of contention.

Johnson was questioned at length during his deposition regarding his day-to-day job duties. He testified that he regularly worked twelve-hour shifts, during which he: removed seeds (a byproduct) from the raw material after a sieving process; loaded tanker trucks and rail cars with emulsion product several times a day; brought in raw materials in bags and 55-gallon drums by rolling them off pallets and placing them on hand carts; weighed raw materials in 5-gallon buckets, lifted them and poured them in vessels; cleaned out tanks; climbed flights of stairs to get to the control room; and stood for prolonged periods to supervise loading. See Pl.'s Resp. to Def.'s 56.1 Statement at 13 (citing Johnson's deposition and other evidence). Even Johnson's supervisor, Zeigler, confirmed that "[t]here's some physical, strenuous activities to it." Zeigler Dep. at 25-26. Zeigler testified that Johnson's job duties included "running the reactor, running samples, finishing the cooldown tank, setting up for the next batch, loading trucks, drumming, filtering and general cleanup, [and] getting raw materials." Id. When asked to expand, Zeigler said that the job also entailed "picking up a hose and hooking it to a fitting so you can load a truck, cleaning the sievers, loading the reactor . . . , cleaning the floor . . . [and] general running of the plant." Id.

Based on the video surveillance Colwell believed that Johnson could have returned to work sooner and with less extensions of his leave. Johnson contends that Colwell's belief is unfounded, however, seeing that his work environment and duties during a 12-hour shift at the plant were much more physically demanding than the few activities, recorded over several days that Johnson engaged in during his leave. Regardless, on May 1, 2007 Colwell sent an e-mail to Kerbert, which indicated that he had previously sent Kerbert copies of the surveillance video. In

that regard, Colwell asked, "Is the content on the DVD's enough to take action?" Pl.'s App., Vol. II, Tab I., Ex. 22. He went on to ask, "In addition should I be crafting a letter to Mr. Johnson to recoup STD money based upon accident insurance payments he must be receiving as the accident victim? I'm fairly certain he is receiving insurance payments for loss of working wages." Id. The record does not reflect how Kerbert responded to Colwell's message, though Colwell testified that their discussion centered on the importance of interviewing Johnson before they took action.

On May 2, 2007 Johnson informed his physical therapist that he was ready to return to work. Two days later, on May 4, 2007 Johnson informed Dr. Cumba that he was ready to return to work, and thus Dr. Cumba released him to return to work as of May 7, 2007. That same day, Colwell sent another e-mail to Kerbert and Daniels, advising them that Johnson informed Colwell that he would be returning to work on May 7, 2007. He noted, "I plan[] to inform Mr. Johnson that [he] is being suspended from work without pay pending a full investigation of his most recent STD claim. Are you in agreement?" Id., Ex. 23. The record does not indicate whether Kerbert or Daniels responded to Colwell's message.

Johnson showed up for work on May 7, 2007, at which time Colwell testified that he confronted Johnson with the surveillance video and provided him with an opportunity to explain why he could engage in the activities on the video but not return to work. Exactly when Colwell confronted Johnson is another point of contention. Johnson asserts that he worked a full day on May 7, 2007 and that Colwell did not confront him until a few days later. Pl.'s Resp. to Def.'s 56.1 Statement at 19. He also denies having the opportunity to explain his actions. Id. There is no dispute, however, that on May 8, 2007 Kerbert sent an e-mail to Colwell with a draft termination letter and recommendations from the company's counsel. She noted, "I'll call you in

6

a moment to discuss." Pl.'s App., Vol. II, Tab I., Ex. 24. Colwell could not recall whether the decision to terminate Johnson was made on May 8, 2007. Colwell Dep. at 184.

Johnson testified that he returned to work on May 11, 2007. That morning Colwell and Zeigler called him into a meeting. According to Johnson, Colwell did not show Johnson the surveillance video, but instead confronted him with a single question – he asked why Johnson couldn't return to work earlier if he could engage in the activities on the video. And after Colwell summarized the video's content, Johnson replied, "What am I supposed to do, sit in a recliner and then turn around and come [back] to work?" Pl.'s Resp. to Def.'s 56.1 Statement at 19. At that point, Colwell didn't say anything, he simply handed Johnson a pre-signed termination letter. The date of the letter was May 11, 2007. It said: "This letter is to advise you that your employment at Reichhold has been terminated effective May 11, 2007. Your termination is based on violation of the company's policies including but not limited to fraudulently obtaining FMLA and STD leave." Pl.'s App., Vol. II, Tab I., Ex. 28.

Defendants deny that the above meeting took place the way Johnson says that it did. Instead they say that Colwell confronted Johnson on May 7 and allowed him the opportunity to explain or "defend" himself regarding the video. See Colwell Dep. at 34-35, 92-93. Colwell testified that when he confronted Johnson, he "provided no defense in any way, shape, or form, and, as a matter of fact, had an expression on his face that he had been caught with his hand in the cookie jar or red-handed," and thus he was terminated. Id. at 38. Zeigler testified that the meeting took place "one or two days after [Johnson] c[a]me back to work," Zeigler Dep. at 19-20, and that Colwell told Zeigler about one half hour before the meeting that he was going to terminate Johnson. Id. at 21.

7

During discovery, the company produced two Performance Reviews that Zeigler completed on Johnson's behalf in January 2006 and March 2007. A few of Zeigler's statements are noteworthy. In Johnson's 2006 Performance Review, Zeigler commented, with respect to Johnson's attendance, that "Bill needs to dramatically improve his attendance. Bill had 4 same day call off's for various reasons, left early 2 days and was on STD for 44 work days this year." Pl.'s App., Vol. II, Tab I., Ex. 30. And, in the 2007 Performance Review, Zeigler noted as to Johnson's attendance, "Bill had 9 short notice vacation days and was on STD for 5 days for 2006. This was better than 2005 but still needs improvement." Id., Ex. 31. At his deposition, Zeigler testified that Johnson's time-off, including his STD time, affected his performance rating. Zeigler Dep. at 8. Zeigler also testified that at some point he spoke to Johnson about his STD time and told Johnson that "it's excessive." Id. at 11. To keep track of an employee's time-off, Zeigler maintained a spreadsheet that listed the amount of STD an employee used, as well as other factors regarding an employee's attendance. Pl.'s App., Vol. II, Tab I., Ex. 32. Zeigler testified that he compiled these numbers "[j]ust in case [management] needed it for something, or I see who – somebody's using a lot of time like that, I can ask them about it." Zeigler Dep. at 13-14.

## B. PROCEDURAL HISTORY

Johnson initiated this case on March 25, 2009. In a three-count complaint, he sued both Defendants for interference with the exercise of his FMLA rights (Count I) and for retaliation for exercising his FMLA rights (Count II). He also sued Reichhold for the company's interference with Johnson's opportunity to become eligible for plan benefits in violation of ERISA § 510 (Count III). On December 21, 2009 Defendants moved for summary judgment. In May 2010 Johnson filed a motion to supplement his memorandum in opposition, and each party was

8

allowed to supplement their previous filings. Defendants' motion for summary judgment is now fully briefed and before the Court.

## II. DISCUSSION

### A. STANDARDS OF DECISION

#### *1. Summary Judgment*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether genuine issues of material fact exist, the reviewing court construes all facts and draws all reasonable inferences in favor of the non-moving party. See Fed. R. Civ. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See U.S v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In contesting a motion for summary judgment, the nonmoving party cannot rest on the pleadings alone; it must instead identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show that a genuine issue of material fact exists. See Vukadinovich v. Bd. of Sch. Tr.'s of N. Newton Sch., 278 F.3d 693, 699 (7th Cir. 2002). The mere existence of some alleged factual dispute, or some perceived metaphysical doubt as to the material facts, will not defeat an otherwise properly supported motion for summary judgment, as speculation will not suffice. Amadio v. Ford Motor Co., 238 F.3d 919, 927 (7th Cir. 2001); see also Borcky v. Maytag Corp., 248 F.3d 691, 695 (7th Cir.

9

2001); Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). It follows,

then, that "conclusory allegations alone cannot defeat a motion for summary judgment."

Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v.

Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)). Finally, in deciding a motion for summary

judgment, the court can only consider evidence that would be admissible at trial under the

Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301

F.3d 610, 613 (7th Cir. 2002).

### 2. General FMLA Standards

The FMLA allows an eligible employee suffering from a serious health condition to take

an unpaid leave of absence for a period of up to twelve work weeks during a twelve month

period. 29 U.S.C. § 2612(a)(1)(D); Smith v. Hope Sch., 560 F.3d 694, 699 (7th Cir. 2009).

After the period of qualified leave expires and the employee returns to work, he or she is entitled

to be reinstated to his or her former position or an equivalent position with the same benefits. 29

U.S.C. § 2614(a). The FMLA establishes two categories of protection for employees –

interference and retaliation. See King v. Preferred Tech. Growth, 166 F.3d 887, 891 (7th Cir.

1991). The statute makes it unlawful for an employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise any FMLA rights, 29 U.S.C. § 2615(a)(1), and prohibits an

employer from retaliating against an employee who exercises his or her FMLA rights. 29 U.S.C.

§ 2615(a)(2). Under these provisions, the FMLA contemplates Johnson's two theories of

recovery, which the Court shall discuss in turn.

### B. FMLA INTERFERENCE

Defendants present two arguments in support of their motion for summary judgment on

Johnson's interference claim. First, they argue that Johnson cannot establish a claim for

interference as a matter of law because Johnson returned to work after his leave, and thus there is no dispute that the company did not deny him his right to reinstatement under the FMLA. Second, Defendants argue that, even if the company denied Johnson's reinstatement, it was allowed to do so because it honestly believed that Johnson fraudulently extended his leave. This is known as the "honest suspicion" defense, which an employer may invoke where it can prove that it would have terminated the employee for abusing his or her FMLA leave. See, e.g., Vail v. Raybestos Prods. Co., 533 F.3d 904, 909 (7th Cir. 2008). To test the sufficiency of these arguments, the Court turns to the following standards.

To prevail on an interference claim, an employee must establish that: "(1) he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled," which includes reinstatement. Burnett v. LFW Inc., 472 F.3d 471, 477 (7th Cir. 2006). In this case, there is no dispute regarding the first four elements. The only issue for this Court to consider is whether Defendants terminated Johnson to prevent him from exercising his right to reinstatement. See Simpson v. Office of the Chief Judge of the Circuit Court of Will County, 559 F.3d 706, 712 (7th Cir. 2009).

It is important to note that the right to reinstatement is not absolute. Kohl's v. Beverly Enters. Wis., Inc., 259 F.3d 799, 804 (7th Cir. 2001). An employee only has a right to reinstatement when he or she is entitled to it; thus an employer may refuse to restore an employee to his or her former position if the company would have fired the employee regardless of whether he or she took leave. Breneisen v. Motorola, Inc., 512 F.3d 972, 978 (7th Cir. 2008). In other words, the FMLA's return-to-work provision applies only to employees on leave from work "'for the intended purpose of the leave,' 29 U.S.C. § 2614(a)(1); an employer is under no

obligation to reinstate an employee who misuses disability leave." Crouch v. Whirlpool Corp.,
447 F.3d 984, 986 (7th Cir. 2006). The Seventh Circuit has "interpreted this to mean that an
employer has not violated the FMLA if it refused to reinstate the employee based on an 'honest
suspicion' that she was abusing her leave." Vail, 533 F.3d at 909.

Here, Johnson returned to work on May 7, 2007. Defendants argue that Colwell
confronted him upon his return and, when Johnson failed to explain why he couldn't return to
work sooner, Defendants terminated his employment. Johnson offers a different account.
Johnson says that he worked a full day on May 7, 2007, and was neither confronted by Colwell
nor terminated until May 11, 2007, the date listed on the termination letter. If Johnson was
indeed terminated on the day of his return, as Defendants say, an inference exists that Defendants
made the decision to terminate Johnson while he was on and because of his leave. More
importantly, however, even if Johnson returned to work, and Defendants reinstated Johnson, this
does not necessarily foreclose a claim for interference, as Defendants argue.

In Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1288 (10th Cir. 2007), the court
allowed plaintiff's interference claim to go forward where her termination was a "foregone
conclusion" by the time she returned to work. The simple fact that an employer allows an
employee to return to work after FMLA leave does not automatically vitiate the employee's
interference claim, where the employer's reinstatement of the employee is "illusory." Vanstory-
Frazier v. CHHS Hosp. Co., LLC, No. 08 C 3918, 2010 WL 22770, at *10 (E.D. Pa. Jan. 4,
2010) (citing id.). In line with this theory, if a reasonable jury finds, based on the evidence, that
Colwell and the others made the decision to terminate Johnson pursuant to factors that predated
his return to work, those jurors may conclude that Johnson's return was simply a means for the
company to avoid liability. This factual question precludes summary judgment. See Campbell,

478 F.3d at 1288 (reversing summary judgment and allowing interference claim, noting "[t]o hold otherwise would create a perverse incentive for employers to make the decision to terminate during an employee's FMLA leave, but allow the employee to return for a brief period before terminating her so as to insulate the employer from an interference claim"); Vanstory-Frazier, 2010 WL 22770, at *10 (denying summary judgment on interference claim where plaintiff returned to work only to find out two weeks later that her position had been terminated).

Next, Defendants urge the Court to grant summary judgment because they had an "honest suspicion" that Johnson did not use his leave for its intended purpose; thus, the argument goes, even if a question exists as to whether Johnson's return to work was illusory, Defendants were entitled to deny his reinstatement because he abused the benefit. It is true that an employer is under no obligation to reinstate an employee where the employer has an honest suspicion that the employee misused his or her disability leave. Crouch, 447 F.3d at 986; Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 681 (7th Cir. 1997) (an employer "need not conclusively prove that [the employee] had misused her leave; an honest suspicion will do"). The question, then, becomes not whether Johnson abused his leave, but whether Defendants could *honestly suspect* that he did, based on the videotape surveillance and other evidence that they cite in support of their suspicion. The Court finds that, in this case, the question is one for the jury to decide.

According to Defendants, their suspicion was based mostly on a fishing trip that Johnson took during his leave in 2005. Following that incident, Defendants maintain that their suspicion was substantiated when, in 2007, they hired an investigator who recorded Johnson mowing his lawn, practicing his fishing cast and driving his car. These activities, Defendants say, were enough for Colwell to suspect that Johnson was able to work and, thus, was abusing his leave.

13

The problem, however, is that according to Johnson, and in some part Zeigler, the job

duties that Johnson regularly performed during his twelve-hour shift were substantially more

strenuous than the activities that Colwell observed on an edited version of the surveillance video.

And while Colwell downplayed the difficulty of Johnson's job, Johnson and Zeigler's direct

testimony contradicts Colwell's. Additionally, Colwell had no medical expertise and thus

testified as a layperson in the form of an opinion as to what a person who had multiple surgeries

on his knees, suffered from a heart condition and was injured in an accident involving an

eighteen-wheel tractor trailer was capable of doing. Zeigler's deposition established that the job

assignment was not sedentary, and that it involved physical strenuous activities. Thus,

depending on which witness a jury believes, it may find that Colwell's suspicion that Johnson

was abusing his leave was not just poorly founded, but arguably baseless. Put another way,

based on the evidence, a reasonable jury could find that Colwell's suspicion was, in fact,

dishonest. This not only justifies the denial of summary judgment, but differentiates this case

from those that Defendants relied upon in support of their position.

For instance, in Kariotis, the Seventh Circuit affirmed summary judgment on plaintiff's

interference claim where the defendant honestly suspected that plaintiff was abusing her leave,

after it viewed a videotape of plaintiff driving, sitting, bending and pushing a grocery cart. 131

F.3d at 680-81. There the court described plaintiff's position as "administrative." Id. at 678.

Her job duties were never called into question. And though the court found defendant's decision

arguably "wrong," there was nothing in the record to indicate that the defendant's suspicion was

baseless. Likewise, in Crouch, defendants asserted the honest suspicion defense after plaintiff's

supervisor noticed that plaintiff, on more than one occasion, requested and took medical leave

for the same dates that he requested and was denied vacation time. 447 F.3d at 986-87. Again

there was nothing in the record that called into doubt defendant's suspicion. And finally, in Vail, defendants suspected that plaintiff was working for her husband's lawn mowing business during her medical leave because they knew of the business and because plaintiff's leave requests became rather frequent during the summer and fall months, "prime mowing season[]." 533 F.3d at 906. The evidence in these cases went unchallenged, which is not the case here. The suspicion in this case stems from Johnson's numerous extensions of his leave in 2007 and Colwell's belief that Johnson went fishing during his medical leave in 2005. But there is also evidence from which a jury could infer that Colwell and Zeigler simply thought Johnson's leave was excessive. It's plausible that neither Colwell nor Zeigler were happy with Johnson's regular leave requests. If that were the case, Defendants were not necessarily motivated by an honest suspicion, but by Johnson's protected conduct. And if Colwell knew that Johnson's on-leave activities did not rise to the level of his job functions, the investigation cannot, without question, support an honest belief that Johnson was abusing his leave. See Weimer v. Honda of Am. Mfg., Inc., No. 06 C 844, 2008 WL 2421648, at *6 (S.D. Ohio June 12, 2008) (rejecting honest suspicion defense where question of fact existed regarding whether plaintiff exceeded the scope of his leave); see generally Nelson v. Oshkosh Truck Corp., No. 07 C 509, 2008 WL 4379557, at *7 (E.D. Wis. Sept. 23, 2008) (finding issue of fact with respect to honest suspicion where evidence existed that called into question defendant's belief that plaintiff could perform the duties of her job). A doubtful suspicion may not be enough to deny summary judgment in most circumstances, but where, as here, the disparity between Johnson's on-leave activities and those he performed on-the-job is substantial, factual questions and credibility determinations become more prevalent. These are not determinations the Court can make on a motion for summary judgment. Accordingly, summary judgment is denied as to Count I.

## C. FMLA RETALIATION

Defendants next argue that Johnson's retaliation claim fails because they terminated Johnson not because of his leave, but pursuant to an honest suspicion that he was abusing his leave. To establish retaliation, or at least a prima facie case, Johnson can proceed under either the direct or indirect methods of proof. Long v. Teachers' Ret. Sys. of Ill., 585 F.3d 344, 349 (7th Cir. 2009) (citing Ridings v. Riverside Med. Ctr., 537 F.3d 755, 771 (7th Cir. 2008)). In this case, Johnson proceeds under both.

A plaintiff can surpass summary judgment on an FMLA retaliation claim either by submitting direct or circumstantial evidence of his employer's discriminatory intent (the direct method)[1], or by establishing that he was treated less favorably than other similarly situated employees who did not request FMLA leave, even though he was performing his job satisfactorily (the indirect method)[2]. Lewis v. Sch. Dist. # 70, 523 F.3d 730, 741 (7th Cir. 2008) (listing elements); Burnett v. LFW, Inc., 472 F.3d 471, 477 (7th Cir. 2006); Daugherty v. Wabash Ctr., Inc., 572 F. Supp. 2d 1003, 1011 (N.D. Ind. 2008). As is usually the case, the two common elements under both the direct and indirect methods are undisputed. Johnson's leave constitutes a statutorily protected activity, and his termination certainly qualifies as a materially adverse action. Burks v. Wis. Dep't of Transp., 464 F.3d 744, 759 (7th Cir. 2006) (classifying termination as an adverse action). As a result, the Court need only determine whether Johnson has presented enough evidence to create an issue of fact as to the remaining elements, which we note above, under either the direct or indirect methods of proof.

---

[1] Under the direct method, an employee must demonstrate: (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by his employer; and (3) there was a causal connection between the statutorily protected activity and the adverse action. Tomanovich v. City of Ind., 457 F.3d 656, 662-63 (7th Cir. 2006).

[2] Under the indirect method, a plaintiff must prove: (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Stone v. City of Ind. Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002)

16

Johnson first proceeds under the direct method, which requires him to show a causal connection between his FMLA leave and his termination. Argyropoulos v. City of Alton, 539 F.3d 724, 733 (7th Cir. 2008). The focus here is on Defendants' intent. To show causation, Johnson must present evidence that Defendants terminated his employment on account of his FMLA leave. Breneisen v. Motorola, Inc., 512 F.3d 972, 979 (7th Cir. 2008); Kohls v. Beverly Enters. Wis. Inc., 259 F.3d 799, 805 (7th Cir. 2001) (holding that to establish a violation of the FMLA, employee must prove that employer would not have discharged her had she not taken FMLA leave). Johnson need not prove that retaliation was the *only* reason for his termination, but "that the protected conduct was a substantial or motivating factor in [Reichhold's] decision." Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005). In this context we ask: What motivated Defendants to terminate Johnson? If Johnson can point to either direct evidence, such as an admission, or circumstantial evidence from which a factfinder can infer discriminatory intent, then typically the causation element is satisfied. Argyropoulos, 539 F.3d at 733-34; Lewis, 523 F.3d at 742; Gates v. Caterpillar, Inc., 513 F.3d 680, 686 (7th Cir. 2008).

Johnson attempts to satisfy causation through several pieces of circumstantial evidence. To name a few, he points out that his supervisors made several statements regarding employees' "excessive" use of leave, specifically Johnson's leave. He also directs the Court's attention to Zeigler's comments about taking into account employees' leave when rating the employees' work performance. There are, indeed, several instances during which Reichhold's management team discussed attendance and Johnson's frequent use of the leave benefit. This evidence does not necessarily rise to the level of direct evidence of discrimination, but it certainly provides the requisite circumstantial evidence from which a reasonable jury could infer Defendants' discriminatory animus.

Moreover, Johnson argues that while Colwell maintains that he gave Johnson the opportunity to defend himself prior to termination, Zeigler testified that the decision to terminate Johnson was made prior to their meeting. Normally temporal proximity is rarely enough by itself to create an issue of fact, but the timing of events "is often an important evidentiary ally of the plaintiff." Lalvani v. Cook County, 269 F.3d 785, 790 (7th Cir. 2001). Here, the temporal proximity of Johnson's leave and his termination is coupled with several pieces of circumstantial evidence that, in the very least, suggest that Reichhold viewed Johnson's leave negatively. There is enough, then, from which a reasonable juror could draw an inference that Reichhold made its decision to terminate Johnson as a result of his FMLA leave. Summary judgment is denied as to Count II.

## D. ERISA § 510

To establish a claim for § 510 ERISA violation, a plaintiff must show: (1) he is a member of a protected class (an ERISA beneficiary); (2) he was qualified for the position; and (3) he was discharged or denied employment under circumstances that indicate his employer had a specific intent to retaliate for his exercise of benefits. See 29 U.S.C. § 1140; Lindemnn v. Mobil Oil Corp., 141 F.3d 290, 296 (7th Cir. 1998). To demonstrate intent, "proof of pretext is required, though circumstantial evidence of pretext is allowed in the context of the familiar McDonnell Douglas burden-shifting approach." Little v. Cox's Supermarkets, 71 F.3d 637, 643 (7th Cir. 1995).

Defendants take the position that Johnson fails to satisfy the second or third prongs of his prima facie case. But their arguments are unavailing. First, as the Court explained above, there is evidence in the record that calls into doubt Colwell's honest belief that Johnson was abusing his medical leave; thus, a question exists as to whether he was qualified for the position. Second,

a question also remains as to Defendants' alleged retaliatory motive in terminating Johnson's employment. The inquiry does not end simply because Reichhold did not save any money when Johnson was discharged, as the company would have us believe. Johnson has put forth evidence that Reichhold may have discharged him as a means of retaliation for using his leave excessively. This provides not only a question with respect to the third element above, but it also provides a sufficient basis to show pretext. This case is not appropriate for summary judgment. The motion is denied as Count III.

## III. CONCLUSION

For the reasons stated above, Defendants Reichhold, Inc. and Thomas Colwell's motion for summary judgment against Plaintiff William L. Johnson is denied in its entirety.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: 8/23/10